```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
        vs.                     )       No. 4:07-CV-1161 (CEJ)
                                )
SETH PASKON,                    )
                                )
            Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before the Court for determination of damages, penalties, and injunctive relief following the jury's verdict on the claims brought by the United States pursuant to the False Claims Act (FCA), and the Controlled Substances Act (CSA). The government seeks an award of $79,113.44 under the FCA and an award of $225,000.00 under the CSA. The government additionally seeks a permanent injunction barring defendant from issuing further prescriptions for controlled substances. Defendant contends that the penalties are excessive and that he lacks the ability to pay them. He also asserts that the request for injunctive relief is moot.

**I.   Background**

On July 31, 2008, a jury found in favor of the United States and against defendant Seth Paskon on the government's claims that Paskon issued medically unnecessary prescriptions for narcotic medications and caused improper claims for those prescriptions to be presented to Medicaid for payment. In addition to completing the verdict form, the jury answered special interrogatories. The

FCA interrogatories asked whether defendant knowingly caused a pharmacy to submit false or fraudulent claims to Medicaid for six specific patients; the jury answered in the affirmative with respect to five patients. The FCA interrogatories also asked whether defendant knowingly submitted false or fraudulent claims for office encounters with four specific patients. The jury answered in the negative for all four patients. The CSA interrogatories asked whether defendant issued prescriptions that were "outside the usual course of medical practice" or "without a legitimate medical purpose" for nine patients; the jury answered in the affirmative with respect to six patients.

On August 4, 2008, defendant posted a notice on the front door of the Potosi Medical Clinic announcing his immediate retirement. On August 19, 2008, defendant signed documents surrendering his state and federal controlled substances registrations. In addition to defendant's voluntary actions, the Drug Enforcement Administration is determining whether to file an administrative action to suspend defendant's federal registration; further, the Missouri Medicaid program has begun proceedings to terminate defendant from participating in that program.

**II. Discussion**

The False Claims Act and the Controlled Substances Act provide that persons who commit violations shall pay penalties for each violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9) (setting penalty range of $5,500 to $11,000); 21 U.S.C. § 842(c)(1) (setting penalty of not more than $25,000). The amount of the penalty is

set by the court, not by the jury.  The Court must determine, first, how many violations have been established by the jury verdict and, second, the amount of penalty to impose for each violation.

### A. The Number of FCA and CSA Violations

The parties agree that the jury interrogatories establish one violation of the CSA for each of six patients and one violation of the FCA for each of four patients.  The parties disagree about the proper interpretation of the interrogatory responses with respect to patient C.P.  At trial, the parties stipulated that defendant wrote two prescriptions for C.P. on each of three office visits between March 30, 2005 and June 2, 2005.  The parties further stipulated that C.P. filled the prescriptions between April 2, 2005 and June 23, 2005.

> The CSA special interrogatory at issue asked:
>
> With regard to C.P., did defendant issue a prescription for a controlled substance during the period between April 2, 2005 through June 23, 2005 that was either outside the usual course of medical practice or without a legitimate medical purpose?

The jury answered "Yes."  Because the stipulation indicated that defendant issued prescriptions on three occasions during the specified time period, the government asserts that the affirmative interrogatory response indicates that the jury found three separate CSA violations.  However, the interrogatory would be answered in the affirmative whether the jury found one, two or three violations.  There is simply no way of knowing from the interrogatory how many prescriptions the jury believed were issued

-3-

outside the usual course of medical practice or without a legitimate medical purpose. Thus, it is certain only that the jury concluded that the government met its burden of proof with respect to one prescription.

The FCA special interrogatory at issue asked:

With regard to C.P., did defendant knowingly cause false or fraudulent claims to be submitted to Medicaid by a pharmacy from March 30, 2005 through June 23, 2005?

The jury answered "Yes." Again, the government seeks penalties for three false claims in connection with prescriptions issued to C.P. However, a claim for payment is "false" only if the underlying prescription was improper. Because the government established only one CSA violation in connection with C.P., only one penalty will be imposed under the False Claims Act in connection with C.P.

Thus, defendant is liable for penalties in connection with seven violations of the CSA and for five violations of the FCA.

### B. Penalty Amounts

Under the CSA, defendant is liable for up to $25,000 for each of seven violations. 21 U.S.C. § 842(c). Under the False Claims Act, defendant is liable for a civil penalty of not less than $5,500 and not more $11,000, plus 3 times the amount of actual damages for each of five claims. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

Courts consider a number of factors in determining monetary penalties under the CSA: (1) the level of defendant's culpability or willfulness, (2) the public harm caused by the violations, (3)

defendant's profits from the violations, and (4) defendant's ability to pay a penalty. Advance Pharmaceutical, Inc. v. United States, 391 F.3d 377, 399 (2nd Cir. 2004); United States v. Little, 59 F. Supp. 2d 177, 186 (D. Mass. 1999).

The CSA does not define willfulness; nor have the parties offered a definition. In other contexts, in order to establish a willful violation of a statute, the government must show that the defendant's conduct was voluntary and purposeful, and committed with the intention to do something the law forbids. See, e.g., United States v. Pomponio, 429 U.S. 10, 12-13 (1976) (addressing "willful" filing of false tax return); United States v. Edelkind, 525 F.3d 388, 398 (5th Cir. 2008) (child support case); United States v. Hitzig, 63 Fed. Appx. 83, 86 n.4, 2003 WL 1871051, 3 (4th Cir. Apr. 14, 2003) (violation of controlled substances act). In this case, there was testimony that defendant ignored or destroyed evidence indicating that many of his patients were using illegal drugs or were diverting the drugs he prescribed. However, there was also evidence that the majority of defendant's patients presented with complex medical, psychiatric, and socioeconomic histories; many patients were diagnosed with intractable pain syndrome and some had histories of substance dependence or abuse. Defendant offered treatment justifications for each of the prescriptions that the jury found to be "outside the usual course of medical practice or without a legitimate medical purpose." While the jury verdict suggests that defendant utilized questionable judgment with respect to those prescriptions, the

Court cannot say that his conduct with respect to those prescriptions was "committed with the intention to do something the law forbids."

In further support of its contention that defendant's violation was willful, the government argues that he was on notice that his prescribing practices were dangerous because the state Board of Healing Arts initiated two proceedings against him. In 1988, defendant entered into a probation agreement with the Board of Healing Arts, pursuant to which he agreed to seek additional training in pharmacology. He completed the required training and his license was fully restored. In 1997, the Circuit Court of Cole County, Missouri set aside the Board's discipline against defendant as "void ab initio, held for naught." Paskon v. State Board of Registration for the Healing Arts, Case No. CV197-821CC, Order and Judgment (Aug. 21, 1997). In 2002, the Board filed a complaint with the Administrative Hearing Commission against defendant. After extensive hearings, the Commission found there was no cause to discipline defendant's license and denied the Board's request for relief. State Board of Registration for the Healing Arts v. Paskon, No. 02-1491 HA (Mar. 27, 2007). In denying the Board's request for discipline, the Commission found that:

> Paskon has established himself as a caring physician who treated Medicaid patients with serious conditions that other doctors would not treat. Similarly, the Board has not established that Paskon has a general lack of professional ability or a general lack of disposition to use his professional ability. Paskon is not incompetent. Nor did Paskon's conduct rise to the level of gross negligence. Paskon was not indifferent to his professional duty.

Id. at 149 [Doc. # 34-8 at 24].  The government's insistence that these two failed disciplinary attempts support a finding of willfulness defies logic.

The second factor to be considered in setting a penalty is harm to the public arising from defendant's conduct.  The government asserts that defendant's prescribing practices caused patient deaths.  The evidence on this point is debatable.  County coroners provided affidavits asserting that they believe defendant is responsible for overdose deaths.  As the Court previously explained, the coroners are not medical professionals and thus their opinions regarding cause of death are not entitled to great weight.  The government did not offer evidence from the examining pathologists; nor did the government attempt to establish that the rate at which defendant's patients died of prescription overdoses exceeds that of other providers with a similar patient population.

The third factor is defendant's profits from his conduct.  The government submits evidence regarding the clinic's income.  However, there is no suggestion that any portion of that income was derived as improper payments for prescriptions or medications and the jury found that defendant did not submit improper claims for medical visits.  Thus, there is no evidence with respect to this factor.

The final factor is defendant's ability to pay a penalty.  The family home is heavily mortgaged; defendant and his wife have paid $8,000 toward a condominium in Farmington, Missouri.  The family vehicles are secured by bank loans.  Furthermore, defendant owes

$823,000 to the Internal Revenue Service. He has no savings accounts or investments and has retired from the practice of medicine and thus has no source of income going forward.

Based upon its analysis of the relevant factors and the evidence, the Court concludes that a penalty of $5,500 per violation of the False Claims Act and $1,000 per violation of the Controlled Substances Act is appropriate. Thus, the total financial penalty to be imposed is as follows: Under the False Claims Act, the government has established that there were five false claims submitted to the Medicaid program for which there were actual damages in the amount of $585.44;[1] the statute directs the Court to treble this amount, for a total of $1,756.32. To this amount must be added a penalty of $5,500.00 for each of five claims, or $27,500.00. The defendant is liable for seven violations of the CSA at $1,000.00 each, for a sum of $7,000.00. The total penalty to be imposed is $36,256.32.

### C. Injunctive Relief

Title 21, section 843(f) of the United States Code authorizes the government to seek injunctive relief tailored to restrain violations of the CSA. The government seeks an order barring defendant from prescribing any controlled substances listed in schedules I - V for a period of two years or until defendant

---

[1] The parties stipulated to the amounts Medicaid paid to pharmacies for filling the prescriptions. They stipulated that Medicaid paid $178.56 for three sets of prescriptions to C.P. As indicated above, the government has conclusively established defendant's liability for only one of the three sets and the Court has accordingly reduced the stipulated amount to $59.52.

-8-

obtains a new DEA registration or prevails in any DEA administrative proceeding. In light of defendant's surrender of his controlled substance registrations, and the pendency of the DEA's decision to seek administrative review, the Court concludes that the government's request for injunctive relief is now moot.

**III. Conclusion**

In conclusion, the government is entitled to peanlties in the amount of $29,256.32 on its FCA claim (Count I), and $7,000 on its CSA claim (Count II). Count III, seeking injunctive relief under the CSA, will be denied.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 10th day of November, 2008.